KONDUROS, J.:
**491 Heather Key (Mother) appeals the family court's order mandating visitation between her child (Child) and Child's paternal grandmother, Lori Brown (Grandmother). Mother maintains the family court erred in finding Grandmother established her right to visitation pursuant to section 63-3-530(33) of the South Carolina Code (Supp. 2018). We reverse.
FACTS/PROCEDURAL BACKGROUND
Mother and Grandmother's son, Justin Cantwell (Father), dated when they were teenagers. Child is a product of that **492 relationship, born in March 2012. In April 2013, when Child was a little over one year old, Father was killed in a car accident. Approximately two weeks prior to Father's death, the relationship between Father and Mother became strained as it appeared Father had become involved with another girl. The relationship between Mother and Grandmother had also become strained as it appeared Grandmother may have been promoting this new relationship. Prior to that time, Mother and Father had spent some time together at Grandmother's home, and after Child was born, Mother and Child would come to Grandmother's house to spend time. Mother and Child would occasionally spend the night at Grandmother's house, but about half of that time, Grandmother left to spend the night with her boyfriend.
After Father's death, the relationship between Mother and Grandmother further deteriorated. For reasons that are not entirely clear, Mother opened a probate case for Father.[1] Notice regarding this matter was received by Grandmother immediately following Father's funeral-a matter that greatly upset Grandmother. A few weeks later, Mother sent a letter to Grandmother stating the probate case was being dropped and neither she nor Child desired anything from Father's estate. According to Mother, this was in response to harassment from Grandmother about the case. The letter also stated, "If you would like to check on [Child] or set up a time to see [Child], you can contact my parents at 803-[XXX-XXXX] or 803-[XXX-XXX]." Mother and Child lived with Mother's parents at all relevant times in this case.
The record demonstrates the parties communicated primarily via text messages.[2] Mother offered to let Grandmother visit with Child on several occasions but wanted those visits to be supervised. Mother testified this was because Child did not have a particularly close bond with Grandmother and because significant tension existed between the parties after several **493 incidents.[3] Mother testified *214 she offered to let Grandmother visit with Child at least once a month for the year after Father's death. Grandmother filed a complaint against Mother in February of 2014 seeking unsupervised visitation.
Grandmother testified she could not specifically recall the date she first contacted Mother about seeing Child but indicated she had texted Mother and Mother's mother, Lisa Day, regarding her desire to visit with Child in the months after Father's death. However, none of those text messages resulted in a visit and the exchanges often deteriorated into an argument. Specifically, in June 2013, Grandmother texted Mother, asking "Can I pick [Child] up Saturday and keep her two hours?" Either Mother or Mrs. Day responded: "I understand nobody has asked to see [Child] but Billy[4 ] and he meets us and comes here. The one time that you asked." The record does not reveal any further communication from Grandmother at that point, but the parties agree a visitation did not occur. Grandmother testified she sent a text on June 28 seeking to pick up Child and spend a few hours together but received no response. At some point, Mother texted Grandmother stating "This is Heather and I told you from now on it has to be supervised. I'm not trying to be mean, but she's still young and you haven't been around her but a few times." In another text, Mother stated, "so you want to see [Child]. Can be supervised. Let me know. Bye." Grandmother responded, "I will not be supervised." Mother also offered to let Grandmother and her boyfriend visit Child at Grandmother's sister's home. Grandmother responded she did not get along with her sister and would just let the judge decide.
On Halloween of 2013, Grandmother requested to see Child and told Mother if she did not hear from her by 2 p.m. she was going to take the case to court. Mother responded that "because you don't want - - want to have somebody around, you can come by the house if you want to bring her something before I take her trick or treating." According to Grandmother, **494 she did not go to Mother's house to visit because she was advised by her attorney not to do so. Two days later, Grandmother contacted the Department of Social Services (DSS) to do a well-being check on Child.[5]
During the months after Father's death, Child visited with other members of Father's family-all supervised and with Mother's support. Grandmother did visit with Child in November 2014 as part of the mediation process in this case and that visit went reasonably well.[6] Grandmother testified a second visitation was set for December 2014 but when she arrived Mother and Child were not there. Mother testified her understanding was that the parties would evaluate how the November visitation went and then determine whether to have a second visitation. Mother testified she was not contacted by her attorney about a December visitation.[7]
The family court determined Mother had unreasonably denied visitation with Grandmother for a period exceeding ninety days and "there are compelling reasons for allowing grandparental visitation; to wit, this is the only child of grandmother's deceased child and the child will likely not know her or her father or the child's paternal family unless visitation is ordered." The family court ordered visitation for every fourth weekend of the month from Saturday at 10 a.m. until Sunday at 6 p.m. This appeal followed.
STANDARD OF REVIEW
On appeal from the family court, this court reviews factual and legal issues de novo.
*215 Simmons v. Simmons , 392 S.C. 412, 414, 709 S.E.2d 666, 667 (2011) ; see also Lewis v. Lewis , 392 S.C. 381, 386, 709 S.E.2d 650, 652 (2011). "Although this court reviews the family court's findings de novo, we are not required to ignore the fact that the [family] court, who saw **495 and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony." Sanders v. Sanders , 396 S.C. 410, 415, 722 S.E.2d 15, 17 (Ct. App. 2011). "The burden is upon the appellant to convince this court that the family court erred in its findings." Id .
LAW/ANALYSIS
Mother contends the family court erred in its application of section 63-3-530(33) resulting in the grant of visitation to Grandmother. We agree.
Section 63-3-530(33) provides the family court has authority:
to order visitation for the grandparent of a minor child where either or both parents of the minor child is or are deceased, or are divorced, or are living separate and apart in different habitats, if the court finds that:
(1) the child's parents or guardians are unreasonably depriving the grandparent of the opportunity to visit with the child, including denying visitation of the minor child to the grandparent for a period exceeding ninety days; and
(2) awarding grandparent visitation would not interfere with the parent-child relationship; and:
(a) the court finds by clear and convincing evidence that the child's parents or guardians are unfit; or
(b) the court finds by clear and convincing evidence that there are compelling circumstances to overcome the presumption that the parental decision is in the child's best interest.
Mother argues Grandmother did not prove all the elements required by the statute, including that Grandmother was unreasonably deprived of the opportunity to visit Child for a period of ninety days. No South Carolina cases have directly addressed the issue of what constitutes an unreasonable deprivation of the opportunity to visit for a period of ninety days as required by section 63-3-530(33).[8] However, the inclusion of **496 the ninety-day requirement suggests our legislature seeks to curb the granting of court-ordered visitation simply because visitation is not of the quantity the grandparent would like. Such a time restriction is in line with preserving the right of parents to make decisions regarding the custody and control of their children. See Troxel v. Granville , 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) ("[W]e have recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children.").
Both parties acknowledge Grandmother had only visited Child twice in the years prior to trial. However, the record reveals Grandmother was offered supervised visitation with Grandmother on multiple occasions during the year following Father's death. Grandmother's central point of contention is that Mother's insistence that visitation be supervised was unreasonable.[9] We cannot agree.
*216 Cases from other states considering this issue are instructive. Indiana courts have considered whether a refusal to give grandparents the visitation they request is sufficient to support court-ordered visitation. In Swartz v. Swartz , 720 N.E.2d 1219, 1222-23 (Ind. Ct. App. 1999), the court held grandparents are not automatically entitled to "have the type of visitation they want." In In re Visitation of C.S.N. , 14 N.E.3d 753, 761-62 (Ind. Ct. App. 2014), the court further expanded on this **497 concept. In that case, the court considered whether the grandparents' desire for overnight visitation was sufficient to override Mother's decision to limit visitation to Sunday afternoons:
This factor [Mother's permitting Sunday visitation] is significant because "once a parent agrees to some visitation, the dispute is no longer over whether the grandparent will have any access to the child, but instead over how often and how much visitation will occur." Where a parent has denied all visitation, the grandparent must "pursu[e] the right to have a relationship with the child." Thus, "the case for judicial intervention" is strengthened. However, where there is merely a "disagreement between parent and grandparent over how much access is appropriate[,]" judicial intervention is more likely to infringe upon the parent's fundamental right.
Id. (citations omitted).
Missouri has a similar statute to the one at issue in this case and its case law suggests the grandparents' opinion as to the quality of the visitation is not controlling in evaluating whether visitation was unreasonably denied. In a case from the Missouri Court of Appeals, the court noted:
The grandparents argue that if we conclude the statute requires unreasonable denial of visitation for more than 90 days as a precondition to court-ordered visitation, then the trial court was still able to determine that they were in fact denied visitation for more than 90 days. They maintain that "there was some visitation within the 90 days, but that does not prohibit the trial court from finding that Mother still unreasonably denied visitation for a period exceeding 90 days." Essentially, the grandparents argue that some of their visits-such as those involving a couple of hours when dropping off gifts for the child, attending a party with the child at her daycare, or having the child in their home for several hours while they wrote thank-you notes after the father's funeral-should not count because the visits perhaps were not as long or as involved or as private as the grandparents wished. ... This argument lacks merit.
Massman v. Massman , 505 S.W.3d 406, 413 (Mo. Ct. App. 2016).
**498 In the present case, Grandmother saw Child in April 2013, at the time of Father's death. For the year following that, Mother testified she was willing for Grandmother to see Child but wanted the visitation supervised because of the hostility between the parties following Father's death and because Child was young and had not spent much time with Grandmother. The record reveals Grandmother's continuing and clear resistance to this condition.[10]
Examining the record as a whole, we find the family court erred in concluding Mother unreasonably deprived Grandmother of the opportunity to visit Child for a period of ninety days. With the exception of the supervised mediation visit, Grandmother refused visitation Mother offered because of the conditions Mother imposed-conditions that were reasonable under the circumstances. Instead, Grandmother insisted on unsupervised visitation and then filed the present action.
*217 We do not suggest a parent can circumvent the statute by intentionally and disingenuously thwarting a grandparent's ability to meet the statutory requirements-for example, by allowing grandparents a fleeting visit with a child every eighty-nine days or intentionally offering visitation when parent knows grandparent cannot be available. Each case must be decided on the particular facts and circumstances presented. However, grandparents refusing to accept the type of visitation offered, provided it is reasonable, likewise fail to carry the day.
Mother could have chosen to give Grandmother the visitation Grandmother desired, but Mother is the party in the superior position in making such decisions. See Camburn v. Smith , 355 S.C. 574, 579, 586 S.E.2d 565, 568 (2003) ("[P]arents and grandparents are not on an equal footing in a contest over visitation."). Grandmother's continuing refusal to be supervised **499 during visitation, threats of a lawsuit, and other antagonistic behavior only exacerbated the tension between the parties.
Furthermore, we cannot base our analysis on what Grandmother states her conduct will be in the future or that she regrets how she may have behaved in the past in the hopes that something good will result for Child. Section 63-3-530(33) is in derogation of the common law and therefore must be strictly construed. See Grier v. AMISUB of S.C., Inc. , 397 S.C. 532, 536, 725 S.E.2d 693, 696 (2012) ("[S]tatutes in derogation of the common law are to be strictly construed."); see also Bowen v. Bowen , 2012 Ark. App. 403, 421 S.W.3d 339, 341 (2012) ("Grandparent visitation is a statutorily created right and in derogation of common law; therefore, we must strictly construe the statute."); In re Visitation of C.R.P. , 909 N.E.2d 1026, 1028 (Ind. Ct. App. 2009) ("The [Grandparent Visitation Act] was enacted in derogation of the common law and must be strictly construed."); Spears v. Weatherall , 385 S.W.3d 547, 550 (Tenn. Ct. App. 2012) (concluding grandparent visitation statutes must be narrowly construed because they are in derogation of the parents' constitutional rights).
Because Grandmother was not unreasonably denied the opportunity to visit with Child, the family court was without authority to impose court-ordered visitation.
The current discord between the parties may mean Mother will be reluctant to deal with Grandmother going forward without court intercession. However, that is a matter on which we cannot speculate and one which does not affect whether the prongs of 63-3-530(33) were satisfied at the time of trial. See Sloan v. Greenville Cty. , 380 S.C. 528, 535, 670 S.E.2d 663, 667 (Ct. App. 2009) ("The court does not concern itself with moot or speculative questions."). Because this issue is dispositive, we decline to address Mother's remaining arguments on appeal. See Futch v. McAllister Towing of Georgetown, Inc. , 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (declining to address the remaining issues when a prior issue was dispositive).
Accordingly, the decision of the family court is
REVERSED.
MCDONALD and HILL, JJ., concur.

Because Child was Father's only heir, Child would have been the beneficiary of Father's estate. The settlement of a lawsuit related to Father's accident ultimately became property of Father's estate. Otherwise, Father had no estate assets.

While some of these texts were admitted at trial, they are not included in the record on appeal. However, several were read into the record or their contents were addressed in witness testimony.

In addition to the probate matter, the parties had some dispute regarding ownership of guns and a television, and Grandmother filed a police report suggesting Mother had stolen family wedding rings, which Mother denied.

Billy is Grandmother's ex-husband and Child's paternal grandfather.

Grandmother testified she did not contact DSS in retaliation for not seeing Child on Halloween, but because she had heard someone involved with drugs was around Child.

Family issues and illnesses prevented the trial of this case from occurring in a more timely manner as it had to be rescheduled twice before the 2016 hearing.

The family court's order does not contain any findings regarding the credibility of the parties.

In this court's recent case, Grantham v. Weatherford , 425 S.C. 111, 117 n.5, 819 S.E.2d 765, 768 n.5 (Ct. App. 2018), the family court's finding on this issue was not appealed.

This is demonstrated by the following exchange between Grandmother and her attorney at trial:
Q. Do you believe that visitation for you with [Child] was withheld? Rephrase the question. Sorry. Do you believe it was unreasonable and continues to be unreasonable for [Mother] to place certain demands on your visitation and/or not allow you to have individual one-on-one visitation with the child?
A. I do.
Q. Why do you believe that?
A. I'm not -- I've never been in jail. Never been in trouble in my life. I've worked in law enforcement. I'm no drug head. I don't do any drugs. I don't drink. I don't go out here and hang out at bars and things. I have a very good reputation in the community and all I want to do is just spend some time with her.
When asked why she should be allowed to see Child unsupervised on a regular basis Grandmother replied:
A. How many other people are supervised to see the baby? - - Am I different because I lost my child? - - What I'm getting to the point at is everyone else has been able to enjoy the baby but me, my ex-husband and [Father's] family.

The record on appeal does not address any specific contact directly between the parties following their exchange on Halloween 2013. In or around October 2013, Mother filed a police report against Grandmother because of what she characterized as "blowing up her phone and following her." Mother filed a second report in December after which police advised Grandmother she should not contact Mother. Mother testified, "The reason she was told not to contact was because I told her all along in those texts that she did not need to contact me unless it was about [Child], but she was contacting me about other things."